## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RAYMOND KOLLAR | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 3:16-CV-01927 (VAB) |
| | : | |
| ALLSTATE INSURANCE CO. and | : | |
| ALLSTATE FINANCIAL SERVICES, LLC, | : | |
| Defendants | : | |
| | : | |

## RULING ON DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Mr. Raymond Kollar ("Mr. Kollar" or "Plaintiff") brings this suit against Defendants Allstate Insurance Company and Allstate Financial Services, LLC (collectively "Defendants"), with whom he was affiliated as a licensed insurance agent. He raises five claims in his Complaint. Specifically, he asserts that both Defendants are liable for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, *et seq*., tortious interference with his business expectancy, and negligent misrepresentation. Defendants move to dismiss all counts.

For the reasons that follow, Defendants' Motion is GRANTED. The Court dismisses all of Mr. Kollar's claims, but does so without prejudice to his filing an amended complaint within thirty (30) days of this decision.

## I. FACTUAL ALLEGATIONS

Defendants Allstate Insurance Company and Allstate Financial Services, LLC ("Defendants") are foreign corporations with their principal offices located at 3075 Sanders Rd., Ste. H2D, Northbrook, Illinois, 60062. Compl., ¶ 2. Defendants are engaged in the sale of

insurance products in the State of Connecticut, in collaboration with insurance agents authorized to act on their behalf.  *Id.*

For many years, Raymond Kollar served as a licensed insurance agent in the State of Connecticut with an office in Trumbull, Connecticut.  Compl., ¶ 1.  Between 1991 and 2003, Mr. Kollar worked as a "sales producer" for Robert D. Richter, an Allstate agent.  *Id.* at ¶ 5. When Mr. Richter retired in 2003, Mr. Kollar purchased his book of business and established his own agency called Allstate—Raymond Kollar Agency.  *Id.*  Mr. Kollar signed an exclusive agency agreement with Defendant Allstate Insurance Company, *see* AllstateR3001S Exclusive Agency Agreement, Ex. B. to Mot. to Dismiss, ECF No. 20-2 ("Contract"), under which he was authorized to act as an insurance agent on Allstate's behalf.  *Id.* at ¶ 3.  The Agency was allegedly Mr. Kollar's "lifework and business," and supported Mr. Kollar and his family for more than a decade.  *Id.* at ¶ 6.

Under the Contract, Allstate would "determine in its sole discretion all matters relating to the business and the operation of the Company including, but not limited to, the following:

> 2. The acceptance or rejection of any application;
> 3. The termination or modification of any contract or the refusal to renew any contract;
> 4. The limitation, restriction, or discontinuance of the writing or selling of any policies, coverages, lines, or kinds of insurance or other Company Business; . . . .

Contract at I.F., pp. 1-2.  The Contract provided that, as an agent, Mr. Kollar could "select [his] sales location, within a geographical area specified by the Company, subject to Company approval."  *Id.* at V.A., pp. 4.  It added, however, that Mr. Kollar had "no exclusive territorial rights" to his sales location.  *Id.*  ("You understand that you have no exclusive territorial rights in connection with your sales location.").  Finally, the Contract explained that the relationship between Mr. Kollar and Allstate could be terminated in several ways, specifically:

2. By either party, with or without cause, upon providing ninety (90) days written notice to the other, or such greater number of days as is required by law. Once written notice of termination has been given by either party, you will, immediately upon request of the Company cease to act or to represent yourself in any way as an agent or representative of the Company, but you will receive compensation pursuant to Section XV. from the Company for the period up to and including the specified termination date;

3. Alternatively, by the Company, with cause, immediately upon providing written notice to you. Cause may include, but is not limited to, breach of this Agreement, fraud, forgery, misrepresentation or conviction of a crime. The list of examples of cause just stated shall not be construed to exclude any other possible ground as cause for termination.

Agreement, XVII.B., pp. 7.

Mr. Kollar alleges that, in 2014, Defendants "improperly caused [his] lifework, business and agency to abruptly end." Compl. at ¶ 7. Mr. Kollar alleges that Defendants caused this harm in several ways, leading to the five claims for relief in his Complaint.

### A. Defendants Allegedly Interfere with the Life Insurance Application Mr. Kollar Submitted on his Wife's Behalf

In early 2014, Mr. Kollar submitted an application in his wife's name for life insurance coverage from Lincoln Benefit Life. Compl., ¶ 9(e). On July 2, 2014, Mr. Kollar's wife received a letter from Lincoln Benefit Life stated that it had "been informed that [she wished] to withdraw [her] application for insurance coverage." *Id.* at ¶ 9(f). Neither Mr. Kollar nor his wife remembered withdrawing the application, he alleges, and they began to investigate. *Id.* at ¶ 9(g). They allegedly "learned that Allstate Regional Financial Services Leader Dan Mattingly, an individual who oversaw the sale of financial service products, improperly interfered with the underwriting decision and caused the application to be denied." *Id.* at ¶ 9(h). They also allegedly learned that there was no other reason why Lincoln Benefit could not have issued the policy. *Id.* at ¶ 9(i).

**B. Defendants Allegedly Improperly Terminate Mr. Kollar's Employment and File a Form U-5 that Allegedly Falsely States that he Failed to Meet Minimum Production Requirements**

Mr. Kollar alleges that he was subject to "minimum production requirements" under the Agreement with Defendants. *See* Compl., ¶ 9. Before 2014, Mr. Kollar had satisfied his production requirements. *Id.* at ¶ 9(b). In 2014, he alleges, he would have satisfied the production requirements as well, because of the Life Insurance application he had submitted on his wife's behalf. *Id.* In July 2014, Allstate Senior Vice President Bill Kavanaugh had informed Mr. Kollar by e-mail that any policy made by an agent on behalf of the agent or his or her "spouse, children, household members, father, or mother [would] no longer be eligible for advanced compensation." *Id.* at ¶ 9(c). According to the e-mail, Mr. Kollar alleges, this policy would be "effective Oct. 1 through Dec. 31, 2014," meaning that his wife's application should have counted towards his production requirements for 2014, which allegedly had a June 30, 2014 deadline. *Id.* at ¶¶ 9(a); 9(c).

On August 20, 2014, Mr. Kollar received a termination letter from Terri Winger, Territorial Sales Manager for Allstate. Compl., ¶ 7; *see also* Letter, Ex. B to Motion to Dismiss, ECF No. 20-3. Mr. Kollar also received copy of a "Form U-5" that Allstate had filed with the Financial Industry Regulatory Authority, Inc. ("FINRA") regarding the termination. Compl. at ¶ 7; *see also* Rev. Form U5, Ex. D to Motion to Dismiss, ECF No. 20-5. The Form notified FINRA of Mr. Kollar's "full termination" and cited, as a "termination explanation," his "failure to meet minimum production requirements as required by the firm." Two weeks earlier, Mr. Kollar alleges, he had received a call from an Allstate employee named Robert Dunn. Compl., ¶ 8. Mr. Dunn allegedly told Mr. Kollar "that he was being terminated because a variable life

insurance policy that was submitted on behalf of Kollar's wife with Lincoln Benefit Life 'was rejected and not issued.'" *Id.* at ¶ 9.

### C. Defendants Improperly Interfere in the Sale of Mr. Kollar's Agency

After Mr. Kollar was terminated, he sold his agency. Under the Contract, Allstate reserved the right to approve the buyer before such a sale. Specifically, Allstate told Mr. Kollar, in the Agreement, that:

> You have an economic interest, as defined in this Agreement and the Incorporated Supplement and EA Manual, in your Allstate customer accounts developed under this Agreement. Subject to the terms and conditions set forth in this Agreement and the incorporated Supplement and EA Manual, you may transfer your entire economic interest in the business written under this Agreement upon termination of this Agreement by selling the economic interest in the business to an approved buyer. The Company retains the right in its exclusive judgment to approve or disapprove such a transfer

Contract, XVI.B., pp. 7. In its termination letter to Mr. Kollar, Allstate reiterated this requirement, stating that "if you elect to sell your economic interest in the book of business, Allstate has the absolute right of approval of the buyer." Letter, 1.

Mr. Kollar alleges that Allstate "interfered with the sale of the agency by refusing to allow qualified, previously-approved agents to purchase the agency, forcing [him] to sell to member of Defendant's management team at substantial loss." Compl. ¶ 15(e).

### D. Defendants Move Another Allstate Agency next to Mr. Kollar's Agency

At some point during Mr. Kollar's tenure as an Allstate agent, he alleges, Defendants "orchestrated the relocation of another Allstate exclusive agency from Fairfield to Trumbull Center, within 700 feet of Kollar's agency in contravention of Defendants' policies." Compl. ¶ 11. The record does not provide details about the policies that Defendant allegedly violated, and the Agreement stated that Mr. Kollar had no "exclusive territorial rights in connection with [his] sales location." Agreement, V.A., pp. 4.

## II. STANDARD OF REVIEW

When considering a motion to dismiss under Fed R. Civ. P. 12(b)(6), the court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir. 2002) (citation omitted), *cert. denied*, 537 U.S. 1089 (2002). The proper consideration is not whether the plaintiff ultimately will prevail, but whether he has stated a claim upon which relief may be granted such that he should be entitled to offer evidence to support his claim. *Id.* at 125 (citation omitted).

When reviewing a complaint under Rule 12(b)(6), the Court applies a "plausibility standard" that is guided by two principles. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). First, the requirement that the Court accept as true the allegations in a complaint "is inapplicable to legal conclusions." *Id.* Although "detailed factual allegations" are not required, a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). Second, to survive a motion to dismiss, the complaint must state a plausible claim for relief. *Iqbal*, 556 U.S. at 679. Determining whether the complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679) (internal quotation marks omitted).

## III. DISCUSSION

Mr. Kollar raises five claims for relief. Specifically, he asserts that both Defendants are liable for breaching the Contract (First Count), breaching the implied covenant of good faith and fair dealing (Second Count), violating the Connecticut Unfair Trade Practices Act ("CUTPA")

(Third Count), tortiously interfering with his business expectancy (Fourth Count), and negligent misrepresentation (Fifth Count).[1]  Defendants move to dismiss all counts.  For the reasons that follow, the Court agrees.

Defendants argue that Mr. Kollar cannot bring his breach of contract and implied covenant of good faith and fair dealing claim against Defendant Allstate Financial Services because it was not a party to the Contract.  The Contract, however, states that "this agreement is between [Mr. Kollar and] Allstate Insurance Company and such affiliates and subsidiaries as are named in the Supplement."  *See* Contract, p. 1.  The Supplement is not in the record, and the Court therefore cannot determine whether Defendant Allstate Financial Services was identified under the Supplement as a party to the Contract.  While the Court recognizes the "general rule that only parties to a contract are bound by its terms," *FCM Grp., Inc. v. Miller*, 300 Conn. 774, 800, 17 A.3d 40, 55 n. 23 (2011), it cannot dismiss the Complaint's first or second counts against Defendant Allstate Financial Services on this basis.  In the forthcoming analysis, it construes counts one and two against both Defendants.

### A.  Count One: Breach of Contract

Defendants move to dismiss Mr. Kollar's first claim, which alleges a breach of contract.  Defendants argue that the definitive language of the contract permitted them to take all of the actions that Mr. Kollar alleges.  Def.'s Mot., 8.  Mr. Kollar asserts in response that he has stated a claim because "Connecticut courts require that discretion, even unfettered discretion, be exercised in good faith."  Opp. Mem., 16.  In addition, he argues that the Court cannot consider Allstate's termination letter, attached to the motion to dismiss as Exhibit 2, on a motion to

---

[1] The Court notes that Mr. Kollar's Complaint omits a Fourth Count, so that the tortious interference claim is labeled "Fifth Count" and the negligent misrepresentation claim is labeled "Sixth Count."

dismiss. *Id.* at 19. The Court agrees with Defendants. Even without considering the attached termination letter, Mr. Kollar's first count should be dismissed.

"The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Chiulli v. Zola*, 97 Conn. App. 699, 706-07 (2006) (Internal quotation marks omitted). When a plaintiff "sets forth a specific contractual obligation and allege[s] that it has not been met," her complaint should not be dismissed. *Commissioner of Labor v. C.J.M Services, Inc*., 268 Conn. 283, 294 (2004). However, "a bald assertion that the defendant has a contractual obligation, without more, is insufficient to survive a motion to strike." *Id.*

Mr. Kollar does not identify a specific contractual obligation in his breach of contract claim. *See* Compl. ¶ 12 ("Defendants' pattern of wrongful and misleading conduct was a breach of the exclusive agency contract and caused Kollar sustained monetary damages."). Rather, he alleges that "Defendants' continuing pattern of deceptive conduct … violat[ed] the implied covenant of good faith and fair dealing and public policy." *Id.* Nor does Mr. Kollar identify specific contractual terms in his opposition to the motion to dismiss, once again choosing to focus on Allstate's bad faith. *See Levine v. Lawrence*, No. 03-CV-1694 (DRH) (ETB), 2005 WL 1412143, at *5 (E.D.N.Y. June 15, 2005) ("[T]he failure to adequately brief an argument constitutes waiver of that argument.") (citing *Raniola v. Bratton*, 243 F.3d 610, 613 n. 1 (2d Cir. 2001)). For this reason, Mr. Kollar's breach of contract claim is better understood as a claim for breach of the implied covenant of good faith and fair dealing. To the extent that he seeks to allege otherwise, Mr. Kollar's breach of contract claim should be dismissed.

**B.  Count Two: Breach of the Implied Covenant of Good Faith and Fair Dealing**

Defendants move to dismiss the second count of Mr. Kollar's Complaint as well, arguing that their alleged actions were in allowed under the Contract and "therefore cannot, as a matter of law, constitute a breach of the implied covenant of good faith and fair dealing."  Opp. Mem., 17. Mr. Kollar responds that, despite the discretion it enjoyed under the Contract, "Allstate still ha[d] an obligation to act in good faith."  Opp. Mem., 8.  The Court agrees with Defendants. Regardless of whether Defendants can breach the implied covenant without breaching the Contract itself, Mr. Kollar fails to state a claim upon which relief can be granted.

In Connecticut, the vast majority of contracts include an implied covenant of good faith and fair dealing, which operates as a rule of interpretation to ensure that rights under the contract are not unfairly impeded.  *Magnan v. Anaconda Indus., Inc*., 193 Conn. 558, 566 (1984) (noting that the Restatement (Second) of Contracts recognizes this covenant in every contract "without limitation") (citing Restatement (Second) of Contracts § 205 (1979)); *Gupta v. New Britain General Hosp*., 239 Conn. 574, 598 (1996) ("Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement.") (citation and internal quotation marks omitted); *De La Concha of Harford, Inc. v. Aetna Life Ins. Co*., 269 Conn. 424, 433 (2004) ("The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term.") (citation and internal quotation marks omitted). The Court sees no reason why the covenant would not apply to the Contract at issue here.

"'To constitute a breach of [the implied covenant], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to

receive under the contract must have been taken in bad faith.'" *Colon v. Commonwealth Annuity and Life Ins. Co.*, No. 3:08-CV-00079 (PCD), 2008 WL 2185923, at *2 (D. Conn. May 22, 2008) (quoting *De La Concha of Hartford, Inc.*, 269 Conn. at 433); *see also Magnan*, 193 Conn. at 567 (describing the covenant as a "rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended."); *Landry v. Spitz*, 102 Conn. App. 34, 43 (Conn. App. Ct. 2007) ("'a party who evades the spirit of the contract… may be liable for breach of the implied covenant of good faith and fair dealing'") (quoting 23 S. WILLISTON ON CONTRACTS §63.22, p. 508 (4th ed. Lord 2002) (alteration in original)).  Bad faith requires fraud, a "design to mislead or deceive another," or "a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's duties, but by some interested or sinister motive." *De la Concha*, 269 Conn. at 433 (internal citations omitted).

"Most courts decline to find a breach of the covenant apart from a breach of an express contract term." *Landry*, 102 Conn. App. at 47 (internal citation omitted); s*ee also Lopiano v. Gedney*, No. X05CV020191749, 2004 WL 2943139, at *7 (Conn. Super. Ct. Nov. 15, 2004) ("Because [Defendant] did not breach its contract, it did not breach any implied duty of good faith and fair dealing."); *Leisure Unlimited, Inc. v. Dep't 56, Inc.*, No. CIV. 3:95CV2039 AHN, 1996 WL 684406, at *5 (D. Conn. May 3, 1996) (dismissing implied covenant claim when Defendants terminated a dealership agreement, noting that "because the terms of dealership agreements expressly provide for unilateral termination … the covenant of good faith and fair dealing may not be applied to override such terms."); *but see Casper v. Combustion Eng'g, Inc.*, No. CV 97-0570516S, 1998 WL 389215, at *8 (Conn. Super. Ct. June 23, 1998) (breach of implied covenant "generally occurs where there is no other contractual breach, or in other words,

where the party lacking good faith has adhered to the letter of the contract") (citing Restatement (Second) of Contracts § 205 (1981)).

At the very least, "the claim that the covenant has been breached must be tied to an alleged breach of a specific contract term, often one that allows for discretion on the part of the party alleged to have violated the duty," and cannot be used to suggest a violation of a contract term that specifically intended to give unlimited discretion to one party. *Landry*, 102 Conn. App. at 47 (internal citations omitted); *see also E. Point Sys., Inc. v. Maxim*, No. 3:13-CV-00215 VLB, 2014 WL 523632, at *5 (D. Conn. Feb. 7, 2014) (dismissing breach of implied covenant counter claim because "Defendants do not cite to any specific provisions of any contract which they allege constituted the basis for the breach of the implied duty of good faith and fair dealing."); *Beckenstein Enterprises–Prestige Park, LLC v. Keller*, 115 Conn. App. 680, 693-94, *cert. denied*, 293 Conn. 916, 979 A.2d 488 (2009) ("[A] claim for breach of the implied covenant of good faith and fair dealing must be based on the terms of the contract and cannot be applied to achieve a result contrary to the express terms."); *Eis v. Meyer*, 213 Conn. 29, 37, 566 A.2d 422, 426 (1989) (covenant of good faith and fair dealing did not require enforcement of easement, even after the defendant's alleged bad faith, when the easement's express terms provided that it would be terminated "at any time when any building [] on any part of the land … is enlarged.").

Mr. Kollar alleges that Defendants breached the covenant of good faith and fair dealing by "engaging in a series of wrongful actions that frustrated Mr. Kollar's ability to receive his contractual benefits." Opp. Mem., 14; Compl., ¶¶ 16-17. He alleges that, among other things, that Defendants improperly interfered with the processing of an insurance application that he submitted in order to decrease his sales so that he would not meet production requirements, *see* Compl. ¶ 15(b), wrongfully terminated his employment based pretextual application of these

production requirements, *id.* at ¶ 15(d), and purposefully located a competing agency 700 feet

from his agency, *id.* at ¶ 15(a).  He also alleges that Defendants "interfer[ed] with the sale of the

agency by refusing to allow qualified, previously-approved agents to purchase the agency,

forcing [him] to sell to member of Defendant's management team at substantial loss."  *Id.* at ¶

15(e).  Mr. Kollar also notes in his Opposition Brief that his "sole compensation consisted of the

commissions that he earned from selling Allstate's products."  Opp. Mem., 11.

 As an initial matter, Connecticut courts have held that an employer's firing of an

employee who it is contractually permitted to terminate without cause does not violate the

covenant of good faith and fair dealing implied in the employment contract.  *Magnan v.*

*Anaconda Industries, Inc.*, 479 A.2d 781 (1984).  In *Mangan*, the court recognized the

applicability of the covenant of good faith to employment contracts, it concluded that a breach of

such an implied covenant cannot be predicated simply upon the absence of good cause for

discharge.  *Id.* at 571-72.  To do otherwise, it held, would "transform the requirement of good

faith into an implied condition that an employee may be dismissed only for good cause."  *Id.* at

571.  Accordingly, Mr. Kollar cannot claim that Defendants violated the covenant of good faith

and fair dealing by terminating his contract without alleging that the termination was against

public policy.

 Mr. Kollar's remaining allegations are similarly deficient.  All of the allegations describe

conduct that was, by the contract, left to Defendants' discretion.  Defendants were permitted to

accept or reject insurance applications "in [their] sole discretion," Contract at I(F), pp. 1-2, and

"retain[ed] the right in its exclusive judgment to approve or disapprove" transfers of his business

after termination.  *Id.* at XVI(B), pp. 7.  The Contract also explicitly provided that Mr. Kollar

had "no exclusive territorial rights in connection with [his] sales location."  *Id.* at V(A), pp. 4.

"A party breaches the implied covenant of good faith and fair dealing by impeding a party's right to receive benefits that he or she reasonably expected to receive under the contract." *De La Concha*, 269 Conn. at 432; *Warner v. Konover*, 210 Conn. 150, 155 (1989) (the implied covenant "forbids the exercise of discretion for the purpose of recapturing opportunities foregone at the formation of the contract," but "permits the exercise of discretion for any purpose reasonable within the contemplation of the parties."). Because the Contract specifically provided that Mr. Kollar had "no exclusive territorial rights in connection with his location," Mr. Kollar could not have reasonably expected Defendants to prevent another Allstate agency from opening in his vicinity. Similarly, the Contract created no obligations or expectations about Defendants' completion of a Form U-5. A "claim that the covenant has been breached must be tied to an alleged breach of a specific contract term," *Landry*, 102 Conn. App. at 47, and Mr. Kollar therefore fails to state a claim with regards to Defendants alleged relocation of a competing agency or submission of a misleading Form U-5.

Mr. Kollar's remaining allegations concern Defendants' denial of his wife's insurance application and their alleged disapproval of a pre-approved buyer for his business. While these allegations are arguably based on "specific contract term[s]," *Landry*, 102 Conn. App. at 47, they still do not sustain a claim of bad faith. "A mere conclusory allegation of bad faith unsupported by any factual allegations, is insufficient to sustain a claim." *Fedora v. Worchester Ins. Co.*, No. CV030285288S, 2004 WL 2397277, at *1 (Conn. Super. Ct. Sept. 28, 2004).

"Superior Court authority is divided as to what factual allegations are sufficient to constitute the element of bad faith," with some requiring dishonest purpose or malice and others requiring only that "the conduct at issue was engaged in purposefully." *Algiere v. Utica Nat. Ins. Co.*, No. CV-040569670, 2005 WL 647808, at *5 (Conn. Super. Ct. Feb. 7, 2005); *Haught v.*

13

*Allied World Assurance Co., (US) Inc*., No. HD-CV-146049226S, 2015 WL 2036502, at *3 (Conn. Super. Ct. Apr. 2, 2015).  At the very least, though, Mr. Kollar is required to provide "particularized facts" to support his claim.  *Allstate Ins. Co. v. Jean-Pierre*, No. 3:10-CV-506 VLB, 2011 WL 3837085, at *4 (D. Conn. Aug. 30, 2011) (allegation that Allstate issued a policy and collected premiums for two years with the knowledge that the plaintiff did not reside at the property, and then subsequently denying coverage under the policy because the plaintiff did not reside there, "along with the assertion that the acts were committed with a bad faith," sufficiently stated a claim); *see also Miller Auto. Corp. v. Jaguar Land Rover N. Am., LLC*, 471 F. App'x 37, 40 (2d Cir. 2012) (observing that the plaintiff dealership could raise a claim for breach of the implied covenant of good faith and fair dealing in connection with the defendant's rejection of his proposed relocation, even though the contract gave the defendant the right to reject relocations, but dismissing the claim because the plaintiff failed to allege the requisite bad faith).

Mr. Kollar alleges only that Defendants "interfered" in the sale of his agency and the processing of his wife's life insurance application.  *See* Compl., ¶¶ 15(b), (e).  While he seems to allege that Defendants sought to drive him out of business, the Contract already permitted Defendants to close Mr. Kollar's agency, and his allegations of improper "interference" and "orchestration" lack the "particularized facts," *Jean-Pierre*, 2011 WL 3837085, at *4, that this Court needs to evaluate his claim.  These allegations do not "suffice to raise an issue about the legitimacy of [the] decision" to deny the insurance application he submitted on behalf of his wife or the proposed buyer of the contract.  *See Warner*, 210 Conn. at 156.  Even when he references discrete contract terms, Mr. Kollar does not state a claim for breach of the implied covenant. Count Two of his Complaint therefore must be dismissed.

### C.  Count Three: Violation of CUTPA

Defendants also argue that Mr. Kollar has failed to state a claim for a violation of CUTPA.  Even if Mr. Kollar has stated a claim for breach of contract, Defendants argue, he has not alleged "substantial aggravating circumstances' that would bring the alleged breach within the ambit of CUTPA."  Def's Mem., 19 (citing *Collins v. A-1 Auto Serv., Inc.*, No. CV106015352S, 2011 WL 5531324, at *2 (Conn. Super. Ct. Oct. 27, 2011)).  Somewhat contradictorily, Defendants also argue that Mr. Kollar's CUTPA claim fails because all of Allstate's alleged misdeeds that were permitted under the Contract, and therefore cannot form the basis of a CUTPA claim.  *See* Def.'s Mem., 20 (citing *Rudel Mach. Co. v. Giddings & Lewis, Inc.*, 68 F. Supp. 2d 118, 130 (D. Conn. 1999)).  The Court nevertheless concludes that Mr. Kollar has not stated a claim for breach of CUTPA.

CUTPA provides that "[n]o person shall engage in . . . unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).  It further provides that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action." Conn. Gen. Stat. § 42-110g(a).  "To determine whether a business practice violates CUTPA, Connecticut courts follow the Federal Trade Commission's 'cigarette rule[.]'" *Aztec Energy Partners, Inc. v. Sensor Switch, Inc.*, 531 F. Supp. 2d 226, 232 (D. Conn. 2007).   The factors to be weighed under the cigarette rule are

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*Fabri v. United Technologies Int'l, Inc.*, 387 F.3d 109, 119-20 (2d Cir. 2004) (internal quotation marks and citation omitted); *Cheshire Mortgage Serv. Inc. v. Montes*, 223 Conn. 80, 612 A.2d 1130, 1143 (1992).  "All three criteria do not need to be satisfied to support a finding of unfairness." *Cheshire Mortgage*, 223 Conn. at 80 (internal quotation marks and citation omitted).

As an initial matter, Mr. Kollar's CUTPA claim does not fail because all of the behavior that Mr. Kollar alleges was permissible under the Contract.  Defendants point to *Rudel*, in which the court granted summary judgment on a CUTPA claim based on a termination that was permissible under the contract between the parties.  *Rudel Mach. Co. v. Giddings & Lewis, Inc.*, 68 F. Supp. 2d 118, 123 (D. Conn. 1999).  In *Rudel*, the plaintiff was a sales representative for the defendant under a contract that allowed the plaintiff to represent defendant's products in certain areas.  *Id.* at 121.  The plaintiff made a substantial portion of its total earnings from selling the defendant's products.  *Id.* at 122.

The agreement also provided that the relationship between the two parties could be terminated "without cause."  *Id.* at 121.  The defendant terminated the agreement, causing alleged financial harm to the plaintiff.  *Id.*  The plaintiff sued under CUTPA, claiming that Plaintiff contends that defendant violated CUTPA by terminating the contract without cause and by "inducing one of the plaintiff's 'key employees' to leave the plaintiff and obtain employment with the distributor/representative that the defendant had selected to replace it."  *Id.* at 130 (citing Second Amended Complaint, ¶ 24).  The Court granted summary judgment on the CUTPA claim, finding that, under the contract, "defendant was permitted to terminate the contract for any reason it wished," meaning that the plaintiff could not, "as a matter of law," base a CUTPA claim on the termination.  *Id.* at 129-30 (noting that it had found "no case in which an act authorized by a valid contractual provision has been found to constitute immoral, unscrupulous,

oppressive or unethical conduct violative of the CUTPA rights of the contracting party"); *see also Ramirez v. Health Net of Ne., Inc.*, 285 Conn. 1, 22 (2008) ("In the present case, however, the plaintiff's claims fail as a matter of law because he has alleged nothing more than that, in terminating his membership, the defendant had availed itself of the rights afforded under the plain and unambiguous terms of the agreement, none of which was hidden or otherwise withheld from the plaintiff.").

*Rudel* and *Ramirez* leave open the possibility that a CUTPA claim can survive, even if the actions underlying the claim were permitted by contract. The allegations in both cases were insufficient because they did not show the required "immoral, unscrupulous, oppressive or unethical conduct violative of the CUTPA rights of the contracting party." *Rudel*, 68 F. Supp. 2d at 130 (D. Conn. 1999); *Ramirez*, 285 Conn. at 22, 938 A.2d at 591 ("[P]laintiff's claims fail as a matter of law because he has alleged nothing more than that, in terminating his membership, the defendant had availed itself of the rights afforded under the plain and unambiguous terms of the agreement."). The courts did not unambiguously hold that conduct permitted under a contract could not violate CUTPA as much as conclude, on summary judgment, that the contractually-permitted behaviors alleged did not rise to the level of a CUTPA violation. *Rudel*, 68 F. Supp. 2d at 130 ("Even assuming that ... conduct [not in breach of the contract] could give rise to a claim under the second prong of the cigarette rule, to be cognizable it would have to entail a degree of bad faith not shown here."); *see also Fabri*, 387 F.3d at 122 (finding that the Defendant violated CUTPA despite not breaching the contract between the parties, because "none of the authorities on which [Defendant] rel[ied] . . . establish that the jury's verdict in favor of defendant on the contract claim precluded it from finding for the Fabris on the CUTPA claim."); *Lopiano*, 2004 WL 2943139, at *6 (dismissing CUTPA claim because "Gedney's

conduct was not unfair, immoral, unethical, oppressive or unscrupulous and therefore did not violate CUTPA. The parties had an agreement that the License Agreement could be terminated for any reason and the parties both understood that the Wagner Darien business could not continue to operate after this License Agreement was terminated.").

Mr. Kollar's CUTPA claim does not fail because it is based on conduct that was permitted by the Contract, but because it does not contain a plausible claim for relief. Mr. Kollar alleges that Defendants violated CUTPA by permitting Mr. Mattingly to interfere with the underwriting decision on Mr. Kollar's wife's insurance application, wrongfully terminating his agency agreement, submitting a form to FINRA that misrepresented his compliance with the firm's minimum production requirements, and interfering with the sale of his agency so that it was sold at a loss. Compl. ¶ 21. He refers to Defendants' "interference" with his business, "wrongful" denial of his wife's insurance policy, and "unfair or unscrupulous trade practices" more generally. *Id*. This "threadbare recital of the elements of a cause of action" is insufficient to state a CUTPA claim. *Iqbal*, 556 U.S. at 678; *see also Nwachukwu v. Liberty Bank*, No. 3:16-CV-00704 (CSH), 2017 WL 2873048, at *18 (D. Conn. July 5, 2017) ("*Iqbal–Twombly* 'plausibility' analysis applies in determining whether a plaintiff has pleaded a viable CUTPA claim.").

Furthermore, Mr. Kollar alleges that he suffered an "ascertainable loss," Compl. ¶ 23, but this allegation, too, is "threadbare." *Iqbal*, 556 U.S. at 678. He fails to specify the losses that Defendants' conduct caused. He does not explain whether he lost a particular commission from his wife's insurance application, a specific amount of business from Defendants' relocation of a competing agency to his vicinity, or certain job opportunities on account of the allegedly false Form U-5. Because "'[a] claim under CUTPA must be pleaded with particularity . . . ,' the

18

plaintiff must . . . plead specific facts indicative of a deprivation, detriment, or injury in order to sufficiently allege an 'ascertainable loss.'" *Advanced Copy Techs., Inc. v. Wiegman*, No. MMXCV156013794S, 2016 WL 8115536, *5 (Conn. Super. Ct. Oct. 19, 2016) (citing *Keller v. Beckenstein*, 117 Conn. App. 550, 569 n.7, *cert. denied*, 294 Conn. 913, 983 A.2d 274 (2009)). Mr. Kollar's Complaint states a "factual conclusion of loss, without any subsidiary factual allegations," *id.* at *6, and therefore does not apprise Defendants of the basis for his claim.  Mr. Kollar's CUTPA claim must be dismissed.

### D.  Count Four: Interference with Business Expectancy

Defendants also seek to dismiss Mr. Kollar's fourth count, which claims that they are liable for tortious interference with business expectancy.  Defendants argue that they "cannot be held liable for interfering with the Plaintiff's alleged business expectancy of future revenue arising from an agreement that [they were] entitled to and did terminate."  Def's Mem., 24.  They also cite cases from other states to argue that "just as a party to a contract cannot interfere with that contract, a party cannot tortiously interfere with a business expectancy created by such contract."  *Id.* at 25.  The Court agrees.

"A successful action for tortious interference with business expectancies requires the satisfaction of three elements: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." *American Diamond Exchange, Inc. v. Alpert*, 101 Conn. App. 83, 90, *cert. denied*, 284 Conn. 901 (2007) (internal quotation marks omitted).  Connecticut courts have "recognized that not every act that disturbs a business expectancy is actionable," and that the interference alleged must be "wrongful by some measure beyond the fact of the interference itself."  *Id.*  Accordingly, "the

plaintiff must plead and prove at least some improper motive or improper means, and that that ... the defendant was guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant acted maliciously." *Id.*

An employee cannot reasonably expect to gain business from a contract that allows his employer to terminate the contract at will. Connecticut courts have recognized a "general rule prohibiting suits for tortious interference between employees," unless the employee committing the alleged violation "is not acting within his corporate powers, and in effect becomes an outsider." *Hackett v. Marquardt & Roche/Meditz & Hackett, Inc.*, No. X02CV990166881S, 2002 WL 31304216, at *4 (Conn. Super. Ct. Sept. 17, 2002); *Weeks v. Office of Urban Affairs*, No. CV92 0339298, 1994 WL 516561, at *4 (Conn. Super. Ct. Sept. 12, 1994) (recognizing, when analyzing claims for tortious interference with business expectancies, that "[t]he general rule applied in the superior court is that there can be no tortious interference of a contract by someone who is directly or indirectly a party to the contract") (internal citations omitted); *Appleton v. Board of Education*, 53 Conn.App. 252, 267 (1999), *rev'd. in part on other grounds*, 254 Conn. 205, 212-14 (2000) ("[T]here can be no intentional interference with contractual relations by someone who is directly or indirectly a party to the contract."); *see also D'Aquila v. Envtl. Sys. Prod., Inc.*, No. CV 93-0455259S, 1993 WL 498756, at *2 (Conn. Super. Ct. Nov. 18, 1993) ("There is, of course, no material distinction between interference with contractual relations and interference with business with respect to the requirement that the tortious conduct be committed by a third party outside of the contractual relationship") (citing *Finman & Son v. Connecticut Truck & Trailer Service*, 169 Conn. 407, 415 (1975) (emphasizing the similarity between claims for "intentional interference with contractual relations" and "unlawful interference with business relations")).

In *D'Aquila*, the plaintiffs sued the defendant, their employer, after it failed to pay commissions that were guaranteed by their employment contract. *D'Aquila*, 1993 WL 498756, *1. This failure, the plaintiffs alleged, constituted tortious interference with business. *Id.* at *2. The court struck the claim because "the plaintiffs do not allege that the defendant interfered in business between the plaintiffs and a third party," but rather alleged tortious interference with business relations that stemmed from the contract itself. *Id.*

Mr. Kollar urges the Court to follow *Garbinski*, in which the plaintiff insurance agent alleged that the defendant interfered with his business expectancy by terminating his employment. *Garbinski v. Nationwide Mut. Ins. Co.*, No. 3:10CV1191 VLB, 2011 WL 3164057, at *13 (D. Conn. July 26, 2011), *aff'd sub nom. Garbinski v. Nationwide Prop. & Cas. Ins. Co.*, 523 F. App'x 24 (2d Cir. 2013). The court in *Garbinski* denied the defendants' motion to dismiss the tortious interference claim, reasoning that, while the agreement between the parties may have permitted termination without cause, the contract was allegedly informed by a more protective statute. *Id.* Specifically, the plaintiff had alleged "that his expectation is based on the Franchise Act[,] which prohibits any contractual waivers of a franchisee's statutory protections." *Id.* (adding that "assuming that the Franchise Act applies to Plaintiff and Defendants' relationship … Plaintiff had a reasonable expectation that he would continue to receive commissions from the sell and renewal of insurance policies.").

Unlike the plaintiff in *Garbinksi*, Mr. Kollar's alleged business expectancy stems solely from the Contract with Defendants. Because he has not alleged that the Franchise Act or anything like it applies to the Contract, Mr. Kollar cannot claim that his termination, which was permitted by the Contract, constituted tortious interference with a business expectancy. He also cannot allege that Defendants "tortiously interfered with the sale of his agency by refusing to

allow qualified, previously-approved agents to purchase the agency, forcing Mr. Kollar to sell to a member of Defendant's management team at substantial loss." Opp. Mem., 23, citing Compl. ¶¶ 7, 11, 15(e) and 21(d). This conduct was also permitted by the Contract between the parties, which gave Defendants "the right in [their] exclusive judgment to approve or disapprove" any transfer of his interest upon termination. Mr. Kollar therefore cannot claim that he reasonably expected to profit from such a transfer, outside of the business that was created by the Contract.

Mr. Kollar's interference claim, however, does not end there. He also alleges that "[by] issuing a Form U-5 to FINRA with statements about [Mr.] Kollar's termination that [Allstate] knew or should have known were false, [Allstate] improperly interfered with the relationships of [Mr.] Kollar with his customers and the business expectancy of [Mr.] Kollar." Opp. Mem. 24-25 (citing Compl., ¶ 26). Mr. Kollar alleges that Defendants' interference deprived him of "premiums and/or commissions from the issuance of insurance or securities products." Compl. ¶ 25.

The Court presumes that this expectation extended beyond his relationship with Allstate to business that Mr. Kollar expected to create in the future, even if he worked with another agency. Because "firms use the [Form U–5] information to help them make informed employment decisions," *Lobaito v. Fin. Indus. Regulatory Auth., Inc.*, No. 13 CIV. 6011 GBD HBP, 2014 WL 4470423, at *5 (S.D.N.Y. Sept. 9, 2014), *aff'd sub nom. Lobaito, Jr. v. Fin. Indus. Regulatory Auth., Inc.*, 599 F. App'x 400 (2d Cir. 2015) (citing FINRA Regulatory Notice 10–39), a misleading or false FINRA application could have an impact on Mr. Kollar's reasonable expectation to continue working as a broker. *See also Rosenberg v. Metlife, Inc.*, 453 F.3d 122, 123 (2d Cir. 2006) ("Although the forms were designed to provide both member firms and the public with information about brokers' conduct, they also can be used to smear and

defame former employees."); *Jordan v. Metro. Life Ins. Co.*, 280 F.Supp.2d 104, 108 n. 6 (S.D.N.Y.2003) ("A negative Form U-5 'can effectively blackball a dealer from the industry.") (internal citation omitted).

Mr. Kollar, however, still must make specific allegations to meet the "plausibility standard" to which this Court must adhere. *Iqbal*, 556 U.S. at 678. Courts have dismissed tortious interference with business expectancy claims when plaintiffs fail "to allege specific opportunities or relationships that the defendant has interfered with." *Holt v. Safeco Ins. Co. of Am.*, No. FSTCV136017661S, 2016 WL 7196408, at *1 (Conn. Super. Ct. Nov. 8, 2016); *Fox v. Williams*, No. TTDCV054002480S, 2008 WL 2746315, at *1 (Conn. Super. Ct. June 24, 2008) (striking tortious interference claim when the "complaint [wa]s devoid of any such specific relationship or relationships. Instead, the complaint merely alleges a breach of a non-compete agreement, which breach had the result of interfering with the plaintiffs' relationships with unidentified customers.").

In this case, Mr. Kollar only asserts that Defendants interfered with his expectation "that he would continue to earn premiums and/or commissions from the issuance of insurance or securities products as well as the maintenance and/or renewal of already existing insurance policies or securities products to customers." Compl. ¶ 25. He does not allege a specific relationship or opportunity that Defendants caused him to forgo. His allegations are therefore insufficient. Mr. Kollar's fourth count is dismissed in its entirety.

### E. Count Five: Negligent Misrepresentation

Defendants also seek to dismiss Mr. Kollar's fifth count. They argue that Mr. Kollar has failed to allege that he reasonably relied on the alleged misrepresentation. Def's Mem., 34. The Court agrees.

"Guided by the principles articulated in § 552 of Restatement (Second) of Torts," courts in Connecticut have "long recognized liability for negligent misrepresentation." *Coppola Const. Co. v. Hoffman Enterprises Ltd. P'ship*, 309 Conn. 342, 351-52 (2013) (citing *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 217 (1987)). A defendant who "supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information." *D'Ulisse-Cupo*, 202 Conn. at 217 (citations omitted; internal quotation marks omitted.) "Traditionally, an action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Coppola*, 309 Conn. at 351-52.

Under the Restatement, a defendant is only liable for negligent misrepresentation to "persons for whose guidance the information is supplied." Restatement (Second) of Torts § 552, Cmt. h (1977) (adding that "it is sufficient, in other words, insofar as the plaintiff's identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them."); *see, e.g. Jacobson v. Environmental Risk Ltd.*, No. CV 950550991, 1996 WL 168086, at *3 (Conn. Super. Ct. Mar. 4, 1996) (observing that "'the absence of a special relationship between the parties [does not] preclud[e] a cause of action based on negligent misrepresentation' [and] a cause of action … brought by a determinate class of people is actionable.") (citing *Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 657 A.2d 212 (1995)).

In *Jacobson*, the plaintiffs alleged that the defendant negligently issued a false environmental investigation report concerning their property. They also alleged that Preferred

Manufacturing, a third-party buyer, reneged on an offer to purchase the land in reliance on this erroneous report. *Jacobson*, 1996 WL 168086, at *1. Because the *Jacobson* court allowed the plaintiffs to state a claim for negligent misrepresentation based on Preferred Manufacturing's reliance on the defendant's misrepresentation, Mr. Kollar argues, he should be allowed to claim an injury based on the insurance industry's reliance on the allegedly false FINRA filing. Opp. Mem., 28.

In *Jacobson*, however, the court observed that the defendant's allegedly false evaluation of the site was "relied upon by both Preferred and the Jacobsons," *Jacobson*, 1996 WL 168086, at *2, and that the Jacobsons had entered into a contract with the defendant to provide environmental assessment services. As he concedes, Mr. Kollar does not allege that he relied upon the representations in the FINRA report. *See* Opp. Mem., 28. He also does not allege that he contracted with Defendants to provide the information to FINRA, or changed his position in anticipation of a FINRA filing.

Mr. Kollar has not alleged that Defendants submitted the FINRA form "for repetition to a certain group or class of persons" in which he belonged. Restatement (Second) of Torts § 552, Cmt. h (1977). He has not alleged that he relied on the misrepresentations in the FINRA form, nor has he alleged that he contracted with Defendants to provide the information. As Mr. Kollar argues, the FINRA form may have caused "legal injury" to Mr. Kollar, despite his lack of reliance. *See* Opp. Mem., 29 (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 653 (2008)). Even if he suffered a cognizable injury, however, Mr. Kollar is required to allege all of the elements of a negligent misrepresentation claim. *Bridge*, 553 U.S. at 656 (acknowledging that "it may be that first-party reliance is an element of a common-law fraud claim," but concluding that "there is no general common-law principle holding that a fraudulent

misrepresentation can cause legal injury only to those who rely on it.").  He has failed to do so. Mr. Kollar's negligent misrepresentation claim therefore is dismissed.

## IV.  CONCLUSION

For the reasons described above, Defendants' Motion to Dismiss is GRANTED without prejudice.

If Mr. Kollar wishes to file an amended complaint addressing the legal deficiencies identified above, he must do so within thirty (30) days of this Order.

SO ORDERED at Bridgeport, Connecticut this 28th day of July, 2017.


/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE