UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RAYMOND KOLLAR,<br>    Plaintiff,<br><br>    v.<br><br>ALLSTATE INSURANCE CO. and<br>ALLSTATE FINANCIAL SERVICES, LLC,<br>    Defendants. | No. 3:16-cv-1927 (VAB) |

**RULING AND ORDER ON MOTION TO DISMISS AMENDED COMPLAINT**

Raymond Kollar ("Plaintiff") brings this suit against Allstate Insurance Company and Allstate Financial Services, LLC (collectively "Defendants"), with whom he was affiliated as a licensed insurance agent. He raises five claims in his Amended Complaint ("Am. Compl."). Am. Compl., ECF No. 46. Specifically, he asserts that both Defendants are liable for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, et seq., tortious interference with Mr. Kollar's business expectancy, and violation of the Connecticut Franchise Act ("Connecticut Franchise Act"). Conn. Gen. Stat. § 42-133e, et seq. Defendants move to dismiss all counts.

For the reasons set forth below, the Court now **GRANTS** Defendants' motion to dismiss as to Counts I-IV, and **DENIES** Defendants' motion to dismiss as to Count V. Counts I-IV are dismissed **WITH PREJUDICE**.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

    **A.  Factual Allegations**

The Court assumes that the parties have familiarity with the original allegations in this

1

lawsuit and therefore only addresses any new and relevant allegations in Mr. Kollar's Amended Complaint below.

**B. Procedural History**

The Court has presided over this case since 2016.

On July 13, 2016, Mr. Kollar filed a Complaint in the Superior Court of Connecticut. Compl., ECF No. 1. On November 22, 2016, Defendants removed the case to this Court. *Id.* On January 5, 2017, Defendants filed a motion to dismiss. ECF No. 20. On January 20, 2017, the Court held a status conference and motion hearing. ECF No. 25.

On July 28, 2017, the Court granted Defendants' motion to dismiss without prejudice and granted Mr. Kollar leave to file an Amended Complaint addressing the legal deficiencies identified by the Court thirty days from Court's Order. Order granting motion to dismiss without prejudice. ECF No. 39; *Kollar v. Allstate Ins. Co.*, No. 3:16-CV-01927 (VAB), 2017 WL 3222535 (D. Conn. July 28, 2017).

Mr. Kollar filed an Amended Complaint on September 1, 2017. Am. Compl. Mr. Kollar's Amended Complaint alleges myriad new facts. Am. Compl. Though the Court has reviewed the Amended Complaint in its entirety, the Court considers those facts that could change the outcome of the defendants' motion to dismiss. *See Muhammad v. Bonner*, No. 05CV1851(RJD)(LB), 2008 WL 926574, at *5 (E.D.N.Y. Mar. 31, 2008) (Denying Plaintiffs' motions for further discovery and a proposed amended complaint because the facts therein would not change the outcome of defendants' motion for summary judgment.).

Regarding Defendants' policies on production requirements, Mr. Kollar alleges that a 2014 memorandum "expressly stated that insurance applications written on a spouse would count towards 2014 production requirements." Am. Compl. ¶ 13. Mr. Kollar also cites the Executive

Agency Independent Contractor Manual ("EAIC Manual"), stating: 'The Company will evaluate your agency's results . . . On a moving 12-month period, a formal consultation will be offered to you if you do not achieve ABO results . . .'" *Id*. at ¶ 14b.

Regarding the pulling of Mrs. Kollar's life insurance policy, Mr. Kollar contends that Bill Christie "sent Mr. Kollar an email stating: 'According to the underwriter, they [Allstate Financial Services] pulled the case due to persistency problems. Persistency is an industry term referring to controlled business." *Id*. at ¶ 21h. Mr. Kollar further alleges that he informed Defendants about the pulling of the policy. *Id*. ¶ 21l.

Regarding the location of another Allstate agency in close proximity to Mr. Kollar's agency, Mr. Kollar contends that the EAIC Manual discourages the merging of satellite locations. *Id*. at ¶ 14c-d. Further, Defendants' Reference Guide on requirements for Sales Locations states: "once you become an R3001 Agent or purchase an R3011 Agency, you will continue to operate from the same office in which your agency is currently doing business." *Id*. at ¶ 14c.

Mr. Kollar contends that "the Territorial Sales Leader permitted the relocation because of a personal relationship with the Field Sales Leader and the relocation of the competing agency would benefit the Field Sales Leader." *Id*. at ¶ 19b. According to Mr. Kollar, the Territorial Sales Leader ignored Mr. Kollar's pictures and proof of his sign and street exposure, which would have made the relocation impermissible. *Id*. at ¶ 19c. Relatedly, Mr. Kollar claims that Alton Davis of Allstate's New England Region said that the relocation of a competing agency in close proximity to Mr. Kollar's was "against pattern" *Id*. at ¶ 19g.

Regarding the sale of the agency, Mr. Kollar alleges that he "presented Allstate Insurance Co. with multiple, qualified, previously-approved Allstate agents who sought to purchase the

agency." *Id.* at ¶ 24a. After rejecting those agents, Defendants purportedly "refused to afford Mr. Kollar additional time to sell the agency." *Id.* at ¶ 24d. Then, an Allstate employee named Robert Dunn bought the agency "at a greatly discounted price," *Id.* at ¶ 24e, allegedly depriving Mr. Kollar of $250,000, *Id.* at ¶ 34d, and violating EAIC Manual guidance that ". . . Allstate is never the buyer or seller." *Id.* at ¶ 30d.

With regard to black-listing, Mr. Kollar now claims that he "has been unable to obtain employment or an independent contractor relationship with at least nine different insurance agencies." *Id.* at ¶ 26.

Generally, Mr. Kollar now contends that he "relied upon . . . the Exclusive Agency Agreement, Supplement, Agency Standards, and other written memoranda in purchasing his economic interest in the agency and operating his agency." *Id.* at ¶ 15.

Defendants now have pending a motion to dismiss the Amended Complaint. Mot. to Dismiss Am. Compl., ECF No. 51.

## III. STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). A court will dismiss any claim that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his

4

'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (internal citations omitted). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

All of the factual allegations in the complaint will be taken as true. *Iqbal*, 556 U.S. at 678. The factual allegations will also be viewed in the light most favorable to the plaintiff, and all inferences will be drawn in favor of the plaintiff. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true."), *cert. denied*, 537 U.S. 1089 (2002).

"Although courts considering motions to dismiss under Rule 12(b)(6) generally must limit [their] analysis to the four corners of the complaint, they may also consider documents that are incorporated in the complaint by reference." *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 258 (S.D.N.Y. 2008). This is particularly true if the Amended Complaint "'relies heavily upon [their] terms and effect,' which renders the document[s] 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)); *see also Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 222 (2d Cir. 2004) (rejecting allegations that were "belied by the letters attached" to the complaint); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (when reviewing a judgment

on the pleadings, courts assume facts alleged are true "unless contradicted by more specific allegations or documentary evidence").

## IV. DISCUSSION

Mr. Kollar raises five claims for relief in his Amended Complaint: breach of contract, breach of the implied covenant of good faith and fair dealing, violation of CUTPA, tortious interference with Mr. Kollar's business expectancy, and violation of the Connecticut Franchise Act. Defendants move to dismiss all counts and argue that Mr. Kollar's Amended Complaint should be dismissed as a matter of law under Fed. R. Civ. P. 12(b)(6). With respect to Counts I-IV, the Court agrees. The Court finds, however, that Mr. Kollar's Amended Complaint has stated a plausible claim for relief under the Connecticut Franchise Act. The Court therefore grants Defendants' motion to dismiss Counts I-IV and denies Defendants' motion to dismiss Count V.

### A. Count I: Breach of Contract

As the Court previously explained: "The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Chiulli v. Zola*, 97 Conn. App. 699, 706-07 (2006) (Internal quotation marks omitted). Concomitantly, "a bald assertion that the defendant has a contractual obligation, without more, is insufficient to survive a motion to strike." *Commissioner of Labor v. C.J.M Services, Inc.*, 268 Conn. 283, 294 (2004). In its previous decision, the Court determined that Mr. Kollar had not identified "a specific contractual obligation in his breach of contract claim." *Kollar*, 2017 WL 3222535, at *4. Mr. Kollar did not remedy this defect in his Amended Complaint.

Mr. Kollar's Amended Complaint relies heavily on the EAIC Manual to substantiate this claim. Compl. at ¶ 30. Mr. Kollar contends that EAIC Manual was incorporated into and altered

6

the terms of his Exclusive Agency Contract, *Id*. at at ¶ 14, and that Defendants' Reference Guide was incorporated into the EAIC Manual, *Id*. at ¶ 14c. He alleges that Defendants breached the EAIC Manual and Reference Guide terms by: 1. failing to provide him a formal consultation when he fell short of his production requirements, *id.* at ¶ 14b, and allowing Mr. Dunn to purchase his agency. *Id*. at ¶ 25e.

Defendants counter that the EAIC Manual clearly resolves disagreement in favor of the Executive Agency Agreement, stating: "To the extent that there is any conflict between any of the provisions of the Manual and the express written terms of the R3001 Agreement, the R3001 Agreement shall govern." Mot. to Dismiss Am. Compl., Ex. B at 5. Additionally, the Reference Guide contains disclaimers such as: "provided for informational purposes only," "does not alter or effect that Agreement's terms in any way" and, "The Reference Guide does not create any rights, duties or obligations of any kind for either you or the Company." Mot. to Dismiss Am. Compl, Ex. C. at 6. Further, Defendants contend that the EAIC Manual prescribed formal consultations once someone had missed their production targets for at least "4 out of the past 12 months," Mot. to Dismiss Am. Compl. at 12, Ex. B at 14, not one month, as Mr. Kollar had. Regarding termination and sale terms, Defendants point to the language of the Executive Agency Agreement, which entitles Defendants to "terminate the agreement without cause upon providing ninety days written notice," Mot. to Dismiss Am. Compl. at 13, Ex. A at 7-8, and to exercise "exclusive judgment to approve or disapprove of any sale." *Id*.

The Court finds that, to the extent that the EAIC Manual and Reference Guide disagree with the Exclusive Agency Agreement, the Executive Agency Agreement governs. Both the EAIC Manual and Reference Guide expressly state that they do not alter the terms of Mr. Kollar's original contract with the Defendants, the Exclusive Agency Agreement. That

7

agreement plainly states: "This Agreement is the sole and entire agency agreement between the Company and you . . ." Mot. to Dismiss Am. Compl., Ex. A at ¶ B. Therefore, the Court cannot, as a matter of law, find that the EAIC Manual and Reference Guide changes the contract terms between Mr. Kollar and Defendants. Because Mr. Kollar has alleged no violation of a specific term of the Executive Agency Agreement, he has not remedied the deficiencies of his Complaint or alleged a plausible claim for breach of contract. Count I of the Amended Complaint therefore must be dismissed.

### B. Count II: Breach of the Implied Covenant of Good Faith and Fair Dealing

Defendants move to dismiss the second count of Mr. Kollar's Complaint on largely the same grounds as the first count: that Mr. Kollar cannot point to a specific provision of the Executive Agency Agreement that was breached in contravention of the implied covenant of good faith and fair dealing. The Court agrees.

As the Court previously explained, an implied covenant of good faith and fair dealing operates as a rule of contract interpretation to ensure that rights under the contract are not unfairly impeded. *Magnan v. Anaconda Indus., Inc.*, 193 Conn. 558, 566 (1984) (noting that the Restatement (Second) of Contracts recognizes this covenant in every contract "without limitation") (citing Restatement (Second) of Contracts § 205 (1979)); *De La Concha of Harford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 433 (2004) ("The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term.") (citation and internal quotation marks omitted). Again, the Court sees no reason why the covenant would not apply to the Executive Agency Agreement. But the application of this implied covenant does not absolve Plaintiff of the burden of pointing to a particular provision of

the contract that has been unfairly impeded.

Regarding the production requirements, Mr. Kollar submits that an e-mail from Bill Christie, a 2014 memorandum, and the EAIC Manual alter the plain language of the Executive Agency Agreement. None of these communications supersede the Executive Agency Agreement for the reasons stated above and in the previous opinion. Under the Executive Agency Agreement, Defendants had "sole discretion" to approve or disprove any policy. Mot. to Dismiss Am. Compl., Ex. A at ¶ (I)F(2). Defendants exercised that discretion with respect to Mrs. Kollar's life insurance policy.

Mr. Kollar's remaining allegations are similarly deficient because they rely on communications outside of the contract, not the contract itself. As explained above, the external writings and conversations cited by Mr. Kollar did not limit or alter Defendants' discretion regarding the location of other Allstate agencies, the termination of Mr. Kollar's agency contract for any reason following 90 (ninety) days prior written notice, and the exclusive right to disapprove a particular sale or transfer of his business after termination. *See, e.g., id.* at XVI(B), XVII(B)(2). Though Mr. Kollar now alleges a dollar figure for his loss and the inability to obtain work "with at least nine different agencies", Am. Compl. at ¶ 26, neither assertion provides "particularized facts" that Defendants improperly interfered with Mr. Kollar's contract rights. *See Kollar*, 2017 WL 3222535, at *7. *Id.* at ¶ 30d. Again, the Court finds that Mr. Kollar has alleged no violation of a specific term of the Executive Agency Agreement, and thus he has not remedied the deficiencies of his Complaint or alleged a plausible claim for breach of contract under Count II. Count II of the Amended Complaint therefore must be dismissed.

### C. Count III: Violation of CUTPA

Mr. Kollar asserts no new specific facts in Count III of the Amended Complaint. Am.

Comp. at ¶ 37-44. In any event, the Court will construe Mr. Kollar's Amended Complaint broadly and incorporate facts from other counts into Count III. Even given that broad reading, Mr. Kollar has not cured the deficiencies of his earlier complaint with regard to CUTPA.

CUTPA provides that "[n]o person shall engage in . . . unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). It further provides that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action." Conn. Gen. Stat. § 42-110g(a). "To determine whether a business practice violates CUTPA, Connecticut courts follow the Federal Trade Commission's 'cigarette rule[.]'" *Aztec Energy Partners, Inc. v. Sensor Switch, Inc.*, 531 F. Supp. 2d 226, 232 (D. Conn. 2007). The factors to be weighed under the cigarette rule are

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*Fabri v. United Technologies Int'l, Inc.*, 387 F.3d 109, 119-20 (2d Cir. 2004) (internal quotation marks and citation omitted); *Cheshire Mortgage Serv. Inc. v. Montes*, 223 Conn. 80, 612 A.2d 1130, 1143 (1992). "All three criteria do not need to be satisfied to support a finding of unfairness." *Cheshire Mortgage*, 223 Conn. at 80 (internal quotation marks and citation omitted).

In its earlier ruling, the Court explained that, in order for a CUTPA claim to survive, Mr. Kollar must provide more than "threadbare recital of the elements of a cause of action" is insufficient to state a CUTPA claim. *Kollar*, 2017 WL 3222535, at *9, citing *Iqbal*, 556 U.S. at 678; see also *Nwachukwu v. Liberty Bank*, No. 3:16-CV-00704 (CSH), 2017 WL 2873048, at *18 (D. Conn. July 5, 2017) ("Iqbal-Twombly 'plausibility' analysis applies in determining

whether a plaintiff has pleaded a viable CUTPA claim.")."

Even given a broad reading, Mr. Kollar still fails to allege facts with sufficient specificity to substantiate a CUTPA violation. For example, Mr. Kollar now claims that he lost $250,000 in unrealized profits when Robert Dunn purchased the agency. *Id*. at ¶ 24d. Mr. Kollar provides no basis for this figure, nor does he explain why a lower sale price would constitute a CUTPA violation *per se*. Additionally, Mr. Kollar now alleges that he lost nine job opportunities because Allstate blacklisted him. *Id*. at ¶ 26. Again, beyond mere conclusory allegations, which are insufficient, *Iqbal*, 556 U.S. at 678; Twombly, 550 U.S. at 555, Mr. Kollar does not plausibly allege that he lost these opportunities because Allstate filed a Financial Industry Regulatory Authority, Inc. ("FINRA") "Form U-5," nor does he allege why a report of his termination to FINRA—which was true and was permitted by the Executive Agency Agreement—would constitute a CUTPA violation.

While the Court acknowledges that Mr. Kollar has alleged two new points of data, those data points, on their own, Mr. Kollar's conclusory allegations fail to demonstrate that Mr. Kollar has a valid CUTPA claim. Count III of the Amended Complaint therefore must be dismissed.

**D.     Count IV: Tortious Interference with Mr. Kollar's Business Expectancy**

Mr. Kollar asserts no new specific facts in Count IV of the Amended Complaint. Am. Comp. at ¶ 45-50. Again, the Court will construe Mr. Kollar's Amended Complaint broadly and incorporate facts from other counts into Count III. Even given that broad reading, Mr. Kollar has not cured the deficiencies of his earlier complaint with regard to tortious interference. Mr. Kollar has still not alleged "a specific relationship or opportunity" that Defendants caused him to forgo. *Kollar*, 2017 WL 3222535, at *11. Mr. Kollar makes no attempt to address the Court's earlier ruling on Count IV. For the reasons set forth in the Court's prior ruling, Mr. Kollar's allegations

are insufficient. Count IV of the Amended Complaint therefore must be dismissed.

### E. Count V: Violation of the Connecticut Franchise Act

In his Amended Complaint, Mr. Kollar alleges violation of the Connecticut Franchise Act. Mr. Kollar contends that "[p]ursuant to the Executive Agency Agreement, [he] was a 'franchisee' as that term is defined in Connecticut General Statutes Section 42-133e(d) and the Defendant[s were]. . . 'franchisor[s]' as that term is defined in Connecticut General Statutes Section 42-133e(c)." Am. Compl. ¶ 55. In support of his CFA claim, Mr. Kollar alleges that he was a "licensed insurance salesman and agent . . .", that "Defendants were insurance corporations engaged in the sale of insurance products . . .", that he and Defendants "entered into the Exclusive Agency Agreement . . . in order to allow Mr. Kollar to act as an insurance salesman on behalf of the Defendants . . ." and that "Allstate regularly acknowledges that it is a franchisor [by] advertis[ing . . .] franchise opportunities online (on such sites as franchisepopportunities.com . . . .")". Am. Compl. ¶ 51-57.

Defendants counter that the Connecticut Supreme Court looks beyond a written agreement in determining "the control indicative of a franchise pursuant to the franchise act." Mot. to Dismiss Am. Compl. at 30, *citing Hartford Elec. Supply Co. v. Allen-Bradley Co.*, 250 Conn. 334, 348 (1999)(in which the court held "that the trial court properly determined that the parties have a franchise relationship pursuant to § 42–133e (b). We further hold that the court properly concluded that the defendant violated § 42–133f (a) . . . ." Id. at 843–44.). Defendants contend that "there are numerous factors that a court should consider in determining whether a franchise relationship exists." Mot. to Dismiss Am. Compl. at 30. Defendants then contend that the facts demonstrate that no franchise relationship existed.

Defendants also claim that the Connecticut General Assembly ("CGA") did not intend for

the Connecticut Franchise Act to cover insurance agency relationships because the CGA "enacted a specific and elaborate statutory framework governing insurance, including an entire chapter of laws devoted to the relationship between insurers and their agents and a specific statute relating to how such a relationship may be terminated." Mot. to Dismiss Am. Compl. at 33.

Defendants finally argue that the ninety days' written notice provided to Mr. Kollar would satisfy the Connecticut Franchise Act's "good cause" requirement. The Court disagrees.

Mr. Kollar has alleged sufficient facts to state a claim upon which relief can be granted under the Connecticut Franchise Act.

The Connecticut Franchise Act defines the term franchise as:

> an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, provided nothing contained herein shall be deemed to create a franchisor-franchisee relationship between the grantor and grantee of a lease, license or concession to sell goods or services upon or appurtenant to the premises of the grantor, which premises are occupied by the grantor primarily for its own independent merchandising activities; and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate, and includes any agreement between a manufacturer, refiner or producer and a distributor, wholesaler or jobber, between a manufacturer, refiner or producer and a retailer, or between a distributor, wholesaler or jobber and a retailer.

Conn. Gen. Stat. Ann. § 42-133e.

The Connecticut Supreme Court prescribed a two-step Connecticut Franchise Act inquiry: "First, the franchisee must have the right to offer, sell or distribute goods or services. Second, the franchisor must substantially prescribe a marketing plan for the offering, selling or distributing of goods or services." *Getty Petroleum Mktg., Inc. v. Ahmad*, 253 Conn. 806, 813 (2000) (*citing Chem–Tek, Inc. v. General Motors Corp.*, 816 F.Supp. 123, 127

13

(D.Conn.1993)). The court in *Getty* emphasized the importance of market risk as a key factor in determining whether a franchise relationship existed. The court held "that it is the independent function of the parties in a marketing arrangement that controls whether the parties have created a franchise." *Getty Petroleum Mktg., Inc.*, 253 Conn. at 815, citing *Automatic Comfort Corp. v. D & R Service, Inc.*, 627 F.Supp. 783, 786 (D.Conn.1986).

Accordingly, the court found that a gas station was not a franchisee; rather, it was a mere caretaker or temporary custodian of the gasoline who "did not own the gasoline or assume any substantial market risk in its sale." *Getty Petroleum Mktg., Inc*., 253 Conn. 818–19. This was true even though Getty Petroleum Marketing, Inc. "had a large amount of control over [the station owner's] sale of gasoline, such as setting the price of the gasoline, requiring a minimum gallonage of gasoline to be sold each month, requiring approval for all signs and advertising, and requiring that the defendants operate the stations during certain hours and in accordance with the plaintiff's standards of quality, appearance, cleanliness and service." *Getty Petroleum Mktg., Inc.*, 253 Conn. at 812.

In other words, the Connecticut Supreme Court's decision in *Getty* suggests that its two-step inquiry is a fact-intensive one. *See id.* at 812-813 ("We do not review the trial court's finding that a marketing plan existed because we conclude that there is no evidence to support the trial court's finding that the defendants were engaged in the business of offering, selling or distributing gasoline under such a marketing plan. We conclude that such evidence was required for there to be franchises."); *see also id.* at 813 ("The following additional facts are necessary to the determination of whether the agreements gave the defendants the right to engage in the business of offering or selling goods under a marketing plan or system.").

Indeed, relying on *Getty*, an independent Nationwide insurance agent was not entitled to

(D.Conn.1993)). The court in *Getty* emphasized the importance of market risk as a key factor in determining whether a franchise relationship existed. The court held "that it is the independent function of the parties in a marketing arrangement that controls whether the parties have created a franchise." *Getty Petroleum Mktg., Inc.*, 253 Conn. at 815, citing *Automatic Comfort Corp. v. D & R Service, Inc.*, 627 F.Supp. 783, 786 (D.Conn.1986).

Accordingly, the court found that a gas station was not a franchisee; rather, it was a mere caretaker or temporary custodian of the gasoline who "did not own the gasoline or assume any substantial market risk in its sale." *Getty Petroleum Mktg., Inc*., 253 Conn. 818–19. This was true even though Getty Petroleum Marketing, Inc. "had a large amount of control over [the station owner's] sale of gasoline, such as setting the price of the gasoline, requiring a minimum gallonage of gasoline to be sold each month, requiring approval for all signs and advertising, and requiring that the defendants operate the stations during certain hours and in accordance with the plaintiff's standards of quality, appearance, cleanliness and service." *Getty Petroleum Mktg., Inc.*, 253 Conn. at 812.

In other words, the Connecticut Supreme Court's decision in *Getty* suggests that its two-step inquiry is a fact-intensive one. *See id.* at 812-813 ("We do not review the trial court's finding that a marketing plan existed because we conclude that there is no evidence to support the trial court's finding that the defendants were engaged in the business of offering, selling or distributing gasoline under such a marketing plan. We conclude that such evidence was required for there to be franchises."); *see also id.* at 813 ("The following additional facts are necessary to the determination of whether the agreements gave the defendants the right to engage in the business of offering or selling goods under a marketing plan or system.").

Indeed, relying on *Getty*, an independent Nationwide insurance agent was not entitled to

the protections of the Connecticut Franchise Act because he failed to satisfy the two-step franchise inquiry. *Garbinski v. Nationwide Prop. & Cas. Ins. Co.*, 523 F. App'x 24, 27 (2d Cir. 2013). Applying the Connecticut Franchise Act in the context of the *Getty* case, the *Garbinski* court held that the Plaintiff failed to show: (1) that Nationwide exercised a franchisor's control over the independent agency's marketing plan for Nationwide products; (2) that, as an independent agent, the Plaintiff was required to buy Nationwide's products before selling them; and (3) that the Plaintiff was required to meet a minimum sales quota. *Garbinski,* WL 3027918, at *9. As a result, Mr. Garbinski's independent agency was not a franchise under the CFA. *Id*. On appeal, the Second Circuit affirmed the *Garbinski* decision on the grounds that the district court had correctly performed a *Getty* inquiry:

> In particular, the District Court observed that 'unlike in a typical franchise, Garbinski did not buy the insurance products from Nationwide before reselling them to clients, nor was he required to do so or meet any minimum sales quota. Rather, Nationwide owned the policies it issued; Garbinski was a commissioned sales representative and never owned the policies himself.' These precise factors led the Connecticut Supreme Court to find that the alleged franchisee in Getty Petroleum Marketing did not "have the right to offer, sell or distribute goods or services" as required for a franchise relationship under the Act. Inasmuch as we see no principled distinction between the alleged franchisee in Getty Petroleum Marketing and Garbinski, we conclude that Garbinski was not covered by the Connecticut Franchise Act.

*Garbinski*, 523 F. App'x at 27. Despite affirming the district court's decision, the Second Circuit court made clear that it was "mak[ing] no comment on whether an insurance agent may ever be a franchisee." *Id*. While neither the district court decision in *Garbinski* nor the Second Circuit's summary order in the *Garbinski* appeal are binding precedent, both demonstrate the importance of fact-finding in determining whether a viable CFA claim exists.

Mr. Kollar's allegations distinguish his case from *Garbinski* and *Getty* in two important ways.

First, unlike Mr. Garbinski, Mr. Kollar had an exclusive agency agreement with Allstate. While Mr. Garbinski sold insurance from Nationwide's competitors, including Progressive and The Hartford, *Garbinski*, 2012 WL 3027918, at *8, Mr. Kollar sold Allstate's products exclusively. Mr. Kollar's Exclusive Agency Agreement specifically prohibited him selling other companies' policies:

> You will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker or refer a prospect to another company, agent, or broker, without the prior written approval of the Company.

Mot. to Dismiss Am. Compl. at 5, Ex. A at ¶ E. The restriction on Mr. Kollar's sale of competitors' insurance products suggests that the resolution of this case should await, at least, the close of discovery.

Second, unlike in *Garbinski or Getty*, Mr. Kollar alleges that Defendants have held themselves out as franchisor(s) online. Am. Compl. ¶ 56. Further, Mr. Kollar has provided website addresses for these purported franchise solicitations. Am. Compl. ¶ 56. Again, Mr. Kollar's allegations raise issues better addressed at a later stage of this litigation.

Defendants recognize that a proper Connecticut Franchise Act inquiry is fact-based, customized, and includes an analysis of the control asserted by a purported franchisor. Def. Mem. of Law in Supp. of Mot. to Dismiss Am. Compl. ("Def. Mem. of Law"), ECF No. 51-1, at 30. But such an analysis is not appropriate at this stage of the case. *See* Garbinski, 2012 WL 3027918, at *7 ("Accordingly, this Court found that 'at the motion to dismiss stage Plaintiff has plausibly pled that the relationship established under the Agent Agreement could state a claim for relief under the Franchise Act.'").

Likewise, Defendants' reference about a conflict with Connecticut insurance law alone, Def. Mem. of Law at 32-34, unsupported by binding Connecticut law, is an insufficient basis for this Court dismissing Mr. Kollar's Connecticut Franchise Act claim on a motion to dismiss.

Finally, Defendants cite no case law for the proposition that the ninety days' written notice provided to Mr. Kollar would satisfy the Connecticut Franchise Act's "good cause" requirement and, in the absence of such precedent, this claim should not be dismissed now, particularly when there is a fact-specific test that could be applied and could very well resolve the issue.

Nevertheless, if after the close of discovery, Defendants move for summary judgment, the legal sufficiency of Mr. Kollar's Connecticut Franchise Act claim may be raised again.

As for Mr. Kollar's other claims, they are dismissed and because the Court granted Mr. Kollar leave to amend his complaint once, these claims are all dismissed with prejudice. Order granting motion to dismiss without prejudice. ECF No. 39.

## IV.  CONCLUSION

For the reasons stated above, Defendant's motion to dismiss the Amended Complaint, ECF No. 51, is **GRANTED** with respect to Counts I-IV, and **DENIED** with respect to Count V. Counts I-IV are dismissed **WITH PREJUDICE**.

**SO ORDERED** at Bridgeport, Connecticut, this 28th day of September, 2018.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE